The next case on the oral argument calendar is Hunt v. Burka. Let's wait for just a minute, Mr. Reardon, until everybody's securely secured your space. Thank you, Your Honor. It's not a problem. You don't have to hurry, counsel. Is that your iPad OK? I was just making sure they didn't leave it there on the table. That's yours, all right. That's my crutch. All right. Well, I try to use those crutches, too, but I'm probably not as good at it as you. Oh, I'm of your generation, Your Honor, I assure you. Anything like that, I have to go to a teenager for assistance with. Your Honors, obviously, the threshold issue here, and it's a very important one, is the question of whether there's IDFA deference in this case or whether this case, court will review the certified question before de novo as if it came up directly from a federal appeal. And we submit that because the California Supreme Court cited three procedural default cases and said nothing more in its August order, then this is a procedural default ruling. Counsel, was the California Supreme Court's judgment in an appeal from a lower court in California? It was, no, it was an original writ. It was an original writ, right. And what did those cases say? What those cases say, in 1998, before the- My recollection of those cases is that all of those cases say quite a bit about a number of different things. That's right. They're all procedural default cases. But for instance, with a case like Clark, which was one of the cases cited, it has any number of potential procedural defaults. There's no pinpoint site in this case. It's generally, it can be dealing with timeliness. The United States Supreme Court in Walker versus Martin said if you pair a Clark citation with a Robbins citation, a 1998 decision, then you know it's about timeliness. But as the magistrate pointed out in this case, without a pinpoint citation, without a Robbins citation, you don't actually know. You know that Clark is a procedural default ruling, but you don't know what it is. And most importantly, you don't know whether it applies- But the Supreme Court didn't cite Robbins. That's right. That's right. And it did cite two other cases. That's right. So what do we learn from those cases? Well, Robbins makes it clear. Waltrius is a default if something has been raised already on appeal. That means it's been here and been decided. It's been somewhere and then it's been- Yeah, it's been here, it's been decided. Miller is, it's been decided on a writ rather than on a direct appeal. And then Clark has many things in it, including timeliness. Right, but with the citation to Waltrius there, doesn't that mean it isn't logical, given the history of this case, that what the California Supreme Court said was, been there, done that? In other words, you've raised issues that have been previously decided by California courts on habeas. Right, and here's why the magistrate was correct in saying that because this is ambiguous, it cannot provoke ed per review. We don't know whether the Waltrius site applies to the certified claim. That night, the writ before the court in 2000 had something like 75 claims before it. And if Waltrius had been applied to the certified claim, this court would find it was not an adequate and independent state ground, because the certified claim was never raised on appeal. However, it seems to me that your biggest point in this is the Penn decision. And it seems to me that in the Penn decision, there was no question they were asking review of the prior decisions. In this particular matter, Hunt didn't ask review for any prior decisions. He only filed another habeas review. And I'm from Idaho, so I guess I can get away with saying this. It seems to me that the California way to deal with habeas is a very confusing system. You can start in the lower court and appeal, or you can skip them all and start with the best court and take your original habeas, right? And so what happened here was he started in the highest court, took an original petition, and now you're suggesting, even though he didn't ask for a review of the other decisions, simply because one or two cases, and I'm not sure I agree with you, but your rationale for one or two cases would suggest, then, his jurisdiction or its stripping of the other authority of the cases. Isn't that your argument? Your Honor, in 1998 in Robbins, in footnote 34, because there had been this confusion, the California Supreme Court said, OK, look. Here's the deal. Waltrius means this. Miller means this. Clark means this. They said, we can, if we choose, also not only procedurally default you, but add the words and we deny it on the merits. They went on to say, if we cite those three cases, it's procedural. If we don't cite those three cases, it's on the merits. So there's just no way to read these three procedural. They're all, admittedly, they're all procedural default cases. There's no way to read them as suggesting that they're anything other than procedural default cases, as opposed to adopting some case on the merits. Is that a pretty important distinction to make? Or if we give deference to the California Court of Appeal decision, do you lose? Well, here's the thing, Your Honor. The other thing that is true, as the court claim here, and let me make this clear. The court claim here is going to be that an attorney, and I'll use the prosecutor's word at trial, did something unheard of. He announced to the judge that he would not interview any defense alibi witness, and he would not ask them any question that wasn't first provided him by the prosecution. And the prosecutor gets up in closing, and he says that it's not me. So this is unheard of. Wait a minute. You didn't answer my question. My question is simple. If I don't agree with you that the 2000 California Supreme Court decision strips these other decisions of any authority, and I give deference, then, to those decisions, do you lose? No. And the reason? Why? That's where you ought to go now. You've only 357 to go. Because there is no California Supreme Court, even if you got past the procedural default, no California Supreme Court, lower court, ever addressed this conflict decision. If you look at the 1998 decision of the Court of Appeal denying a writ, it makes no reference to the facts of it and simply says, we're going to decide IAC cases by Strickland standards. So there's nothing to defer to. There's nothing to defer to. There is no reason, decision of this conflict claim, which is the reason for my prelude, Your Honor, that the notion that an attorney stood up, told the judge that he would be ineffective by never interviewing defense witnesses. And the prosecutor gets up and says, you know what the? Counsel, you've written. I want to make sure I'm very clear here. As I understand the nature of your IAC claim, you've made two different claims, two different ways of approaching this. One is that Mr. Barron's had a conflict. And the second is that he just simply was ineffective. Okay? Now, as to the second one, that clearly has been addressed by California courts. Well, various parts of it were addressed specifically. Right. And in that case, based on Judge Smith's presumption, that is, if he disagrees with you on the nature of the California Supreme Court, then we would have to give that predeference at least to the question of whether there was ineffective assistance in failing to interview people, perhaps not on the conflict question. Fair enough. But in 10 minutes, I'm going to go to the core of it. And that's why. I mean, Judge Bybee has stolen my questions, because I'm really trying to figure out what you're really saying. If you're going to the prejudice issue, the conflict, if you will, between the two, California didn't deal with that, did they? I hope this answers your question, Your Honor. What we are saying here is that there was no decision. There's a procedural default. There's no substantive merits decision in the lower courts of the claim that because Barron's was accused of criminality or potential criminality, he completely, because of that personal conflict, did not perform the defense. And so in that instance, we would exercise what review? Because that claim was both procedurally defaulted, and there's nothing to defer to, you decided de novo under Manholt, this court's decision in Manholt. And this court's decision in Manholt says that if you're accused of a crime related to anything dealing with your client, you must disqualify yourself And because the attorney in that case did not, they said the adverse effect of that was that he did not competently present evidence or cross-examine, which is precisely the situation here. But even under Strickland, Your Honor, I would say this. If you were to decide that under a Strickland standard, that obvious deficiency, because he says to the court, I'm not going to do anything that a lawyer would do, and the prosecutor says it's unheard of, the prosecutor gets up and says, that is proof of guilt. The way that this lawyer deficiently presented this evidence is proof of guilt. How can that not undermine the confidence in the verdict when two things are true? The prosecutor knows that's not true, because he knows the reason that Barron's was doing this. He announced it to the court, was the Titus allegation. And the defense can't get up and object to this false argument, because what's it going to do? Get up and say, that's not true. It's not that my client is guilty. It's that I'm trying to protect myself from potential prosecution on a claim that I was going to suborn perjury. Counsel, is the Titus allegation, is that your best argument? Is that your strongest argument? It is definitely our lead argument, that the Titus allegation. I read the Titus testimony this morning. I have to be honest with you. It wasn't very impressive. Your Honor, it is not how powerful it is. It's that this Barron's admits to the court, he uses the word Titus. And we've cited in our brief, he's saying, I want you to know I'm not going to interview any of these witnesses. You know about the Titus thing. We've cited that in this argument. And so he viewed it as something that was so threatening to him that he had to forego interviewing defense witnesses, exculpatory defense witnesses, and examining them on the basis only of a memo from a prosecutor. And so can you explain the theory of conflict here succinctly to me? Yes, Your Honor. And I think I understand it. But I'd like to hear it from you very succinctly. And let me, I'm going to very succinctly attempt to summarize 27 to 37 of our opening brief. It is this. Titus says this guy is going to go manufacture alibi witnesses. Barron's gets up in front of the court and says, Your Honor, I want you to know I'm not going to interview any of these witnesses. And when a particular witness gets up here, I am only going to ask her questions that track the prosecution's memo on this. I will not interview her. I will not ask a question outside the scope of it. And the reason for that is. This was in the context of the Tucson students, right? Yes, yes. And the reason for that is I want you to be assured that I'm not doing anything that I've been accused of here. But how could that have even been a plausible possibility? Since Barron's didn't come up with them, it was the prosecutor who said, we've got to tell you, we've heard from these students in Tucson and we've interviewed them. Barron's didn't know anything about it. How could that possibly have implicated a conflict in Barron's? Well, Barron's may be an idiot, but the fact is he articulated that it was a conflict. And because he did, you saw the prosecutor in closing said, did you see a word of that? Any investigation? Not one finger was lifted. Not only that, they made a big point in saying they didn't even talk to these people until March sometime. That is unheard of. And then he goes on to say that, did they lift one figure? No. And what that, I'm going to put in big letter, red letters on the bottom of this chart, what this means. Joe Hunt's conscious of guilt. That's what it means the next day he goes back to the big red letters argument in closing. So Barron's may be a fool. He may be an idiot. But nonetheless, he tells the court, I am forsaking the critical defense function of preparing witnesses. And I am doing that. And he says it's Titus related. He therefore examines the defense witnesses in a way that allows the prosecutor to say, this is unheard of. It's unheard of. And there's only one explanation of it, Joe Hunt's guilt. When we know the explanation for it, as given to the court, was the Titus allegation. Your honors, I submit to you that it meets the standard of adverse effect under Keiler and Manholt. But your honor, I would submit to you that it obviously fits the standard of undermining confidence in the verdict. And I believe it's de novo review. But even if you were to defer to state court findings, rulings, you will find nothing in the state court that addresses the Titus complex of facts. I want to answer any other questions. Otherwise, I'd ask for at least a minute or so to respond. I'll be happy to give you a minute to respond. I haven't any questions. Thank you, Mr. Reardon. I think I understood better what he was saying now. Good morning, your honors. May it please the court. Elaine Timonis, Deputy Attorney General for Respondent. I'm going to start with the specifics and then move on to the general in response to my opponent's argument. The defense team did interview Canchola and Lopez. They went to Arizona to interview them. Barron's interviewed them before they testified. They had to get a subpoena to get Canchola into LA to testify because she had become reluctant to do so. Barron's did his job. The defense team did its job. And what matters at the end of the day is not what defense counsel might have been thinking, but what did he do? What was his performance in the case? And as far as the Arizona witnesses are concerned, Barron's performed like a constitutionally effective attorney. Regarding the standard of review, review is deferential under ADEPA here because for several reasons. One is that a higher court's decision under California's rather unique habeas scheme is an original jurisdiction. Each level of court has original jurisdiction. So a higher court's habeas ruling does not nullify, eviscerate, or otherwise change a lower court's habeas ruling. In this case, and so it's possible to look past that to see what the state courts did and to defer to any lower state court merits ruling, which existed in this case on petitioner's claims. The cases cited by the California Supreme Court, the district court found that decision to be ambiguous. And I explained and so could look through it because the court couldn't tell which claim the case citations applied to. But if those citations do anything at all, it's to leave intact the lower state court's merits rulings. Waltria says you don't get to renew a claim on habeas that was previously raised and rejected on appeal. Miller says that a habeas petition is being rejected for the same reasons that it was rejected earlier. And Clark, without a pinpoint citation, even the district court said you can't tell what it's being cited for. And it could have been cited to bolster the citations to Waltria and Miller. So what council argues is the fact that Clark was cited and the fact that there isn't a pin site, the fact that Clark is cited and it's a little bit different than either Waltria or Miller, that that would make it all ambiguous and therefore we ought to have to novel review. That's his argument. Right. And I think the problem with that argument and the problem with even some of the cases that Petitioner cites in his reply brief, which are unreported district court cases, some of these cases kind of, and Petitioner in particular here, confusingly conflates the analysis of whether a case and a claim has been exhausted or procedurally barred on the one hand with the question of what deference is due to the state court decisions on the merits on the other hand. And the deference issue clearly isn't confined to the highest state court decision. It's the last reasoned decision. Well, it's whatever the state court's merits rulings have been. And often the language that's used to discuss that is Yilts's last reasoned decision language. But I think it's helpful to remember that Yilts was a pre-EDPA case, excuse me, pre-EDPA case and didn't directly address and couldn't have anticipated addressing what deference is due to a particular state court decision under 2254, 2254D. And there's no question in this case this was an original second habeas in the Supreme Court. Right. Were there any claims that have been discussed here today that were raised for the first time before the California Supreme Court have been raised below? How about the conflict claim? The district court found that all of the claims addressed here had been raised either in this petition or in previous petitions. But as to all of them, it found some state court merits ruling below. And so it's our position that deference should be applied to those lower state court decisions. The only that there were a couple of. And even the conflict? The conflict claim was raised in petitioners March 29, 1996 supplemental petition filed on the first day that the evidentiary hearing in state court began. And those claims were addressed on their merits by the California Court of Appeal, summarily denied with a statement that no prejudice resulted. And the district court looked to that decision to which it was able to give deference. It's true that the court of appeal decision didn't go into detail about that claim, but it was raised. And these claims in a habeas case like this, they tend to morph over time. So there was a different conflict claim raised below on different grounds that isn't a subject of this appeal. But the district court was pretty clear that a couple of other claims not at issue here had not been addressed on the merits in the state courts. And it gave de novo review to those claims. The rest of them, it gave deferential review under AEDPA. Under any standard, however, it's our position that petitioners ineffective assistance claims have to fail. They have to be evaluated in light of the overwhelming evidence against petitioner presented at trial, his multiple confessions to multiple people, the handwritten to-do list he left behind at the apartment when Levin was killed, his co-defendant Pittman's impersonating Levin the day after the murder, flying to New York using Levin's name and stolen credit card, petitioner's appearance early the next morning after Levin was killed in possession of Levin's signed $1.5 million check and contract, and more. In light of that evidence, petitioner's ineffective assistance claims, his claims that counsel should have done something differently or better have no merit. All of the evidence that he contends should have been investigated or presented at trial was vetted in a very thorough 13-day evidentiary hearing at which 30 witnesses testified, 19 of them called by petitioner. The state court made factual and credibility findings that are binding in this court under any standard of review and found that- This is the Los Angeles Superior Court hearing, which the California Court of Appeal remanded to have the hearing. Right. On direct appeal, the Court of Appeal remanded it to the Superior Court for an evidentiary hearing. And that's the hearing I'm referencing. OK, I just wanted to make sure I have the right hearing. Yeah. And the court found that the witnesses defense counsel claims should have been called were either not credible, some of them utterly so, their testimony would have been inconsistent with the defense theory that Levin had masterminded his own disappearance to escape his criminal prosecution and financial and legal troubles, that defense counsel didn't have information or wasn't on notice sufficient to warrant the defense to have investigated these people, they came forward too late to testify in the guilt phase or even in the penalty phase or at trial at all, and or their testimony would have been cumulative. So all of those findings the Superior Court made demonstrated that counsel had acted properly. And there are countless ways to try a case and even attorneys of the highest caliber, no two attorneys will try a case the same way. But here defense counsel made reasonable tactical and strategic decisions to present evidence consistent with the defense that Levin had masterminded his disappearance, evidence that defense counsel found credible and they explicitly found, Barron's testified that he thought Cancella and Lopez were credible and that he didn't want to present non-credible so-called citing witnesses that could have undermined those more favorable witnesses. And he made decisions to stay away from evidence that would have been inconsistent with that theory or wouldn't have been credible at all. The citing witnesses claimed to have seen Levin out and about in West LA, which is generally the part of town where Levin had lived and where the trial was taking place, that they had seen him out and about before or during the trial, which would have been inconsistent with the evidence with the defense theory that he had fled or disappeared. And Cancella and Lopez, the Arizona witnesses testimony that they saw him in Arizona was consistent with the testimony that he had left town. I was gonna say, it seems to me at least the Arizona testimony is consistent. That's right, that's right. But we're really there. Your argument is that as to those, they were interviewed and he made a tactical decision not to call them. That's right. And some of them came forward, as I said, very late in the game as well. Robinson, for instance, came forward after when the jury was already deliberating. And he actually came to court on April 20 while the jury was in deliberations, he had contacted the district attorney. And in court, the district attorney explained that they'd given him a polygraph, which he'd failed. He'd lied to the DA about when he claimed not to have known anything about the Levin trial, even though he was a journalist, when he supposedly saw Levin in Westwood while he was waiting for a movie showing six months earlier. I mean, he wasn't credible and Barron's had a good basis for deciding not to present his testimony. Anything further, counsel? Thanks. I just want to add that every court, every state court and the federal court that has heard these claims and heard this evidence has decided that Levin is dead, that Petitioner killed him. And as the California Court of Appeals said, none of the collateral notions raised  can change that immutable reality. Thank you, counsel. Thank you. Thank you. Thank you, counsel. Mr. Reardon, I'll give you a minute. Three very brief points. I want to be procedurally clear. The conflict claim was never presented, and the magistrate found this, to the California Supreme Court until the 2000 petition, which was denied. Now, wait a minute. Was it presented to any other California court? Your Honor, I- What about what counsel just said? Yes, it was presented to the California Court of Appeal in a supplemental petition, and I direct you to page ER, volume two, ER 272. They talk about Strickland. There is no mention of conflict. There is no mention of Kyler. There is no mention of Titus. There is no mention of Barron. So I'm saying, Your Honor, there is no merits ruling on the conflict claim to defer to, even if you could look past the three- Well, that's very different from saying the conflict claim was never presented until we got to the California Supreme Court. It was raised. I hope I'm clear, Your Honor. It was not presented to the California Supreme Court until the 2000 petition. Yeah, but what difference does it make whether it was raised to the California Supreme Court, as long as it was raised to some California court for which there was a final judgment? It makes all the difference in the world, of course, if this court respects the procedural default rulings of the California Supreme Court. That's their only ruling on it. They could have done it on the merits. They only did it on procedural grounds, and I would submit that there's- But they could have done it, at least with Waltrius, they could have done it on the grounds that had been previously decided and not appealed. Right, but it, no, Waltrius applies to direct appeals. So if Waltrius was the holding there, that would be inadequate, because that would be false. Miller is the one that would say it was- I was going to say, what about Miller? Right, Miller- I mean, Waltrius, I get your point, and you're very good, and so therefore, I'm glad you got there, but Miller is definitely against you. Right, but there is no, the magistrate's ruling, and it is very clear that there's a lot of Ninth Circuit law you'd have to overrule, is that if it's ambiguous, and any one of, you would have to prove that all three of these are valid as to the certified claim, because we don't know, without a specification as to what subclaim these apply to, what the California Supreme Court's procedural ruling was. We know it's procedural, but we can't determine that it was, what it was, and how it applied to this. Very quickly, on page 32, Mr. Barron says- I'm sorry, page 32 of what? I'm sorry, of my opening brief, or our opening brief. He says he's going to be very sanitary with the witness, and he mentions the Titus allegation as being the reason. On page 30, he says, what I have done, Your Honor, I have not even made up my own questions, and this is as to the Arizona witness. I have used the prosecutor's questions and other police's questions, and I am mimicking and reading these questions from the tape. That is what the prosecutor correctly says is unheard of. What defense attorney relies solely on a prosecutor's memo to present a critical defense witness, and then we get to the question, that's an adverse effect, but when you get to prejudice, and the prosecutor stands up and says, that is consciousness of guilt on Hunt's part, how doesn't that undermine confidence of the verdict when we know that was not the reason that the examination was conducted in that way? Thank you very much, Your Honor. Thank you. Thank both counsel for the argument. Hunt v. Virga is ordered submitted. The last case on the oral argument calendar is Silva v. MBB Properties. Good morning, Your Honors, if it please the court, Janet Lawson on behalf of the Silva, the appellant. This case is without a doubt a question of violation of the automatic stay. I think that both the district court and the lower court have to acknowledge that the stay was violated, and so then the question becomes. I guess it depends on, a violation depends on whether there's an exception or not. Correct, that was gonna be my next sentence. I mean, the bottom line is, there is no violation if there's an exception, so. Correct. I just don't want you to get us off on the wrong foot here, and I hope you know I'm not on the wrong foot. I read the code because I represented defendants and debtors and creditors in bankruptcy, so I don't know that you can say it's a violation, but go ahead. Well, that was my. Make your argument. My next sentence was, unless they can prove that there was a violation, I mean, an exception. Now, the lower court, the bankruptcy court, said, geez, it's 549, 549C. But that clearly does not apply, because those are post-petition transfers. And the recording of the trustee's deed of sale was not the date of the transfer, all right? The transfer occurred at Folgerdale. So the bankruptcy court says it's 362B, but doesn't go to 24, it goes to three, right? Correct. And you're not claiming that it's somehow an error not to do the same thing that the bankruptcy court used, are you, by the district court? I don't understand your question. Well, the district court didn't go along with the bankruptcy court. The district court went for 362B24. Correct. Now, you're not claiming that it was error for the district court to use a different section, are you? No, I understand that they have the right to make an independent decision. And in fact, we could make a different section ourselves. Correct, I understand that. So I'm just trying to make sure I understand your theory. So if we're to look at B24, the automatic stay does not apply if the transfer is avoidable under either section 544 or avoidable under 549, right? Correct. That's the district court's decision. Correct. So if we go to 544, how do you meet the statute of limitations? Well, Your Honor, we have the conduct of the Bulleggs who waited. Well, now, just a minute. You filed bankruptcy on August the 10th of 2010. Correct. You should have done something by August the 10th of 2012. Two years. Not exactly, Your Honor. I think that's the Weissman case. Yeah, it's a two-year statute under 11 U.S.C. 546A1A. Correct, but Ms. Silva was unaware of all of the facts. So you're going to ask for equitable tolling here? Correct. All right, so I just want to make sure I'm understanding your argument. So if I go to equitable tolling, what's my standard of review? De novo. No. Equitable tolling is abuse of discretion. Show me the case that says it's de novo. You're right, I'm wrong. Okay, so it's abuse of discretion. So I have to now give the bankruptcy court discretionary review here, right? Okay, so has she been pursuing her rights diligently? That's the question I'm going to ask. Because that will tell me whether she has any right to equitable tolling, right? Correct. So in September 2009, Silva was given notice that Bullogs had purchased the property. Correct. She did nothing. Correct. She had a foreclosure of her second mortgage. Correct. She says she doesn't know about it. Correct. But she doesn't pay it. Correct. She never does anything about it. That is true. So she's got a second mortgage she never pays. She's got a man who comes and says, other people own your property. And then in June 2009, there's a notice of default and a notice of sale which were filed. No, Your Honor. The notice of sale was in February of 2009. Okay, let's even go to February. My worry is that once I get all that laid out, I can't think that she's been pursuing her rights diligently. Well, if you look at the Weisman case. I did. Okay, and what they're talking about in the Weisman case is stale information. It isn't stale if somebody tells you somebody's purchased your property. If you've got a second mortgage and you never pay it and you don't know what's going on with it, but you know you had it and it isn't being collected. And if you, and I know she doesn't have to go down to the courthouse, but really she does because if they file the notice, it's as if she went to the courthouse. Correct. So at that point, she has to do something. They filed nothing. That isn't a, there was a notice filed that there was going to be a foreclosure sale. And that sale was continued. It doesn't matter, there was a notice filed. That is correct. And if she knows that and she knows somebody told her that somebody had purchased her property and she doesn't do it, she never pays her second mortgage or even worries about it, I don't know how that can say I pursued my rights diligently. Well, she unfortunately relied on the advice of someone who was trying to get her a loan modification. But the problem is that now you're saying, and you agreed with me, it's abuse of discretion. Correct. So how can I say that the bankruptcy court would have thought this is without doubt something she should have got equitable tolling about? Because it's an abuse of discretion standard. But the information that she got was completely incomplete. Well, but just a minute. We're not talking now about whether I would give her the credit or not. We're talking about if you have those facts in front of you and you say, you're not entitled to equitable tolling, that I can say as now the appellate court, you've abused your discretion. I don't understand how you can get me there. I believe that you can get there because the information that she was given was incomplete. Information in which? Well, the fellow comes out and says, you don't own the property. He gives her no paperwork. Okay. But doesn't it at least put her on notice to go and look? I mean, she knows she's not making the payments. But if she went and looked, she would have found nothing. But did she go and look? She did not go look. That is not true that she would have found nothing. She would have found nothing because nothing was reported. She would have found a notice of foreclosure. She would have found the notice of sale. Right. And that's it. But that's nothing. That's pretty good. Doesn't she have to, if she had done that, wouldn't she have had to have listed that on her bankruptcy application? Part of the problem here, I mean, there's some equities that run both ways. Correct. One is that Bollock doesn't go back and record this to give her the formal notice that we ordinarily expect in a property transaction. But she had already been told by somebody, by a guy who came and says, I'm surprised you're here because we've just bought this property. She knows she's not making the payments. She can't be too surprised at this. But she doesn't make any inquiry. But wouldn't she have an obligation to have listed that on her bankruptcy application? I believe that a year later, she probably should have. Okay, so if we can't get there under, if, now I'm just going under the statute, 562B24, avoidable under section 544, no, because probably the statute of limitations was gone. Then we move to 549. If I look at 549, and I read what you said to me, and I'm just trying to make sure I understand. You do not argue, as I understand your brief, that BULOGs fit the criteria for 549 if 549 can apply to a creditor-initiated transfer, right? Correct. So if 549 can apply to a creditor-initiated transfer, then you lose. If it can apply? Yes. Correct. Okay. So what's the purpose of 362? Purpose of 362 is to protect against creditor-initiated transfers. It's not. In fact, we got a case, dead on, for 4235 Washington State Core, 329 Fed Third at 1081, says the purpose of 362 is to protect against creditor-initiated transfers. Frankly, that's what I thought the exceptions of 362 were about, to protect against creditor-initiated transfers. So if the whole purpose of 362 is to protect against creditor-initiated transfers, then how can I suggest that because 549 in the history of the statute, if you will, is applied to debtor-initiated transfers, if 549 can only apply to debtor-initiated transfers, it seems to me what you're arguing under statutory construction is that there is no reason for 362-24. Because 549 is sitting right there under 362-24. If you can only do that on debtor-initiated transfers, it's never gonna be a debtor-initiated transfer in any time when I'm gonna apply 362-24. So there is no reason for 362-24. I think Judge Pappas accurately described 362-24 as being a double negative, and that you have to look at it. While I like Judge Pappas, and I think he's a wonderful guy, and he lives right down the street from me, and he's got an office right in the same courtroom with me, I don't agree with him. There is no way I can read 362-24 even with the double negative and make it apply in this situation. So answer my question. If I don't agree with him, how can, why do you even have 362-24 on the books if it is only to do with debtor-initiated transfers? Because I think in that particular subsection of 362, they brought in that code section 549, which is entitled post-petition transfers. And in this case, there was not a post-petition transfer. All right, so we have to back up and look at the facts. You're going to another fight that you're making under 549, but I'm listing, I'm only talking about statutory construction of 549. And your statutory construction argument on 549 is that it's only a debtor-initiated ones and therefore it is cannot be used. All I'm trying to do is say to you, I do not know under the terms of statutory construction how this could only be debtor-initiated because if it's only debtor-initiated, then you can never have 362-24 as an exception. I'm just having you explain that to me. I'm going to be candid with you. I don't have an explanation. All right, I just wanted to make sure because I'm reading through this stuff. I'm representing debtors and creditors in my old life. And I'm trying to understand your arguments. So thank you very much for your answers. And your straight answers, frankly. That I appreciate it. You're welcome. If I could have a couple of minutes for rebuttal. Of course. Thank you. I'm going to put my arms and shoulders to the responding parties. May it please the court. Your Honor, I too, I've been doing bankruptcy law for close to 30 years. And I spent a lot of time scratching my head over section 362. How possibly, given the cases from the Ninth Circuit, could we have 362-24? How could it apply? And the only thing that I could come up with, which is what we argued in our brief, is that although there are cases from the Ninth Circuit that says that section 549 only applies when the debtor transfers something, the only thing that made sense to me, and that's why it's in our brief, is that, well, by putting when Congress fanged the bankruptcy laws in 2005 and added subsection 24, the only thing that they could have been thinking of, or the only thing that makes sense to make the bankruptcy code work, is if the rules of section 549 would apply even where, like we have in this case, the debtor didn't transfer anything. The creditor did. Okay. Why don't you take me through why the bankruptcy court is correct? Because I'll be fair. I tried to give some explanation to why the bankruptcy court would be correct, and I'd have to side with your opposition. Okay. I think the only way you win is if the district court is correct. Well, again, certainly as a matter of law, whether the district court pick the right section or the bankruptcy court pick the right section, that doesn't matter. I understand. But it's- But if I agree with her, if I come down the bottom line, I say, I've got a lot of presidents sitting here. It doesn't seem to work if you're going to do statutory construction. So I got to go the alternative. Convince me the bankruptcy court was right. Okay. So we have, so the first thing that we need to do is we start with section 362B3. Right. And section 362B3 then sends us down to section 546A, excuse me, section 546B1. Right. A. And section 546B1A refers to three sections. One of them just doesn't apply. But it refers to section 544, it refers to section, and then of course it refers to section 545 that doesn't apply. It refers to, and then the last section that we have. See. So section 544, if you look at that, there's two reasons why it is that we win. There's the statute of limitations issue that you've already discussed. Yes. If you want to hear more from me on that, I'm happy to do so. But I mean, it seems quite clear to me that when somebody comes and knocks on your door and says you don't own this property anymore, we do. And when you have a notice of sale saying your property's going to be sold at a foreclosure sale. And when we have the debtor's conduct, which is the debtor does nothing about this, it would be very peculiar to me if you take everything else and put it to one side that you're not making mortgage payments anymore. It's like the second trustee holder just went off into the ether. So how they get past that, I just don't know. But let's just assume for a moment that they do. Well, I'll be fair. I'm going to shortcut you. Seems to me the relevant question here is whether California state law will permit the perfection of the boo logs interest in the property. In other words, recording of the trustee's deed to take precedence over the trustee's legal property to the legal title to the property. And it would. And MBB or you, it seems, concedes that California civil code section 2924HC does not apply. Correct. And you have not identified any other state law that prioritizes the boo logs post petition recording over the trustee's interest in the property. Well, we have civil, see, I think I know. I mean, I'm taking you right to the point. Right. And I get it. So if we take, see, if we take section 19, okay, of the California civil code, that says, and this court has construed it several times, that a buyer of real property is on notice of everything that the buyer would know if the buyer looked at the, if the buyer looked at the title, the chain of title. So, and that law applies to every real estate transaction in the state. So under that law, let's just say hypothetically for a moment, I was going to buy the property that we have here in question. The bollocks have not recorded their deed. I come in, I want to buy this property. I make an offer. The offer is accepted. I go to a title company. That's the way it works. Title company prints out a list of all of the items that would deal with this property. And what would I see when I looked at the record for this property? I would see that there was a notice of sale, that somebody was going to foreclose. Now, under California law, I would not be in a position, I don't think, to simply say, oh, well, I could ignore that. Because under California law, section 19 of the civil code, I would be required to make an inquiry. That's what the law says. That's what the cases say. And if I made that inquiry, I would pick up the telephone, I would call the holder of the second trust deed, and I would say, did you have a foreclosure sale on whatever the date was, August 19th of 2009? And they would say yes. And I would say, hmm, who bought the property? And they would tell me the names of the buyers, the bollocks. At that point, acting like a reasonable person, which is what section 19 requires me to do, if I went through with the transaction, if I went through with the transaction having full knowledge that the bollocks had bought this property, even though they didn't record their deed, if the bollocks subsequently came along and said, we win and you lose, Joe Shoulder, you shouldn't have bought this property, you were unnoticed and we owned it, I'd lose. That is consistent with the prior cases of this court, which don't deal with a title record, but similarly, they deal with deeds. In one of the cases of this court, somebody had a deed, they didn't record the deed, but there were, see, construction stakes and it looked like there was some activity there and what the court held in that case, the Robasco case, was you were unnoticed. You were unnoticed that somebody else owned this property. See, the Wiseman case, which was your second case on this point, that was the one where the guy got married, or excuse me, I guess he got divorced. And- I was gonna say, I didn't think he got married. No, he got divorced. And, but his ex-wife still was shown on the title. The ex-wife got married again, filed a bankruptcy case, the bankruptcy trustee came in and said, hey, the ex-wife still owns half this house. This court said, no, it doesn't, because a reasonable person under section 19 of the civil code would be required to go out of that house and find out why these people are living there. Now, those cases, admittedly, don't deal with a title record. I was gonna say, I don't know whether I can directly apply those cases to this particular matter. Because you should, and here's why, because under section 19 of the civil code, there's a couple of kinds of notice. One of them is, what knowledge would you have if you went out to the property and you saw what was going on? Those are the cases this court has decided, this court has addressed. The second group of cases is where you haven't gone out to the property yet, but you still are required to look at the title record. And we certainly can't have real estate transactions in this state, and I'm sure throughout the country, where people are not required to look at a title record. And if you saw the title record here, there's no ambiguity about this. It's acknowledged, there's no issue of fact. You look at the title record, as I explained, you are gonna see that somebody was gonna sell this property. Now, had you done that under section 19, you couldn't have bought the property and had a right to that property that was senior to my clients. You couldn't do it. And that is why, that is why when we were going down our chain of statutes, that's why section 546B1A is the next link in the chain, and that is how it applies. So now we go to section 544. We talked about the statute of limitations already.  With respect to section 544A3, in any event, if I lose on the statute of limitations, you're still in the same spot. I was gonna say you're in the same spot as in B3, aren't you? Correct, correct. And so now, so now we go back to the last section, which again, the section 549, why I was scratching my head. One of, there's either two results here. Either section 49 just doesn't apply, in which case the only thing this court would have to look at is section 544. Well, I don't know whether I can write 549 out. And I don't think you can either. And that's why, although it would have been an easy path for me in my brief, I didn't take that path. I argued section 549 as well. So if we go back to section 549, the key. I think I understand your argument as to 549. Very well. Because I tried to put it to her. No, I understand. Your Honor, I've got nothing further then, unless the court asks questions of me. I don't think there are any further questions. Thank you, Mr. Scholder. Thank you. Ms. Lawson. Thank you, Your Honor. Your Honor, with all due respect to Mr. Scholder, who is a friend of mine, I believe he made an error in discussing section 19 of the California Civil Code. This is a race notice jurisdiction. The one who records first is the winner. So it doesn't matter that the title record would show that there was a notice of default. And when you go back to Weissman, they talk about how long it was. In this case, it was 18 months from the notice, from the time of the notice of sale to the bankruptcy. And it talks about the staleness of that notice. So there are many cases where a trustee has prevailed over an unrecorded deed. And that's not an uncommon event in a bankruptcy practice. So. I'm sorry, what prevails over an unrecorded deed? The trustee. The trustee trying to avoid the unrecorded deed. It's a pretty common scenario. So I don't think that they can prevail on that point. And the other thing about ProBasco is Silva was the one in the property, unmolested. No one was bothering her. No one was asking her for payment. So, you know, there's good facts and bad facts on both sides but I think when you get to the bottom of it, the equities lie with Silva because to be real candid, what the Bulldogs did was mean. They intended to leave her in that property. It was a plan to leave her in that property. They wanted her. Would it have been a favor to her, to have foreclosed on her and gotten her off the property? She had places to go. Well, yes, but if she had places to go, why didn't she go there? I mean, as opposed to having to, as opposed to being forced to go there by the Bulldogs and forcing their rights. But it seems to me that the backing off, were they collecting any rent from her? No, that's specific in the record. They agreed not to. Ask for anything. I guess I'm having a hard time figuring out what was mean about letting her stay there. Well, there's no evidence in the record but the question would become, what's the rental value versus the payment? And that's not in the record. The problem I have with your argument is this. Seemed to me that one could say they were mean, but it also seems to me that one could easily say, they were nice. They were paying her second mortgage and she never cared. One could say that, but if you look at the top line. The bottom line is the second mortgage was foreclosed. They took it out. They paid it off. She didn't ever have to pay it. They never took her out. Correct. And the reason they didn't take her out is because there was no value in the property. They saw no reason to expend funds to take her out and there was nothing they could get from over the first. So they didn't worry. So what they did is they paid her second mortgage and continued to pay it and continued to pay it and she got the benefit. That's one way to look at it, which is not mean as you're suggesting. Okay. I'll withdraw the word mean. All right. And in the meantime, she also cleared her arrearages on the first mortgage through the Chapter 13 plan. I understand that. So she was paying more than the mortgage. She was making that makeup payment. And so over the course of the time, I think at the time we wrote our brief, it was approximating $60,000. No, it was more than that that she paid to remain in that property. Unless the court has further questions. I don't think so. All right, thank you. Thank you, Ms. Lawson. We thank both counsel for the argument in a complicated statutory scheme that completes the calendar for the day and for the week. The court is adjourned. And I thank you both for your direct answers to my questions. That was very good. Thank you. Especially, thank you for that. All rise. This court for this session stands adjourned. Thank you. Yeah, I'm gonna reach in there tomorrow. Yeah, I'm gonna have to sit there and complain. Yeah. Yeah. Yeah. There'd be a game of the top of the two and there was, but that was the only thing. Well, thank you, Jenny. It was very nice to meet you. It was nice to meet you again, Joe. Thank you.
judges: Bybee, N.R. Smith, Stein